# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTATE OF REGINA FLOOD         :
By and through its Executor, Laurie Flood  :
1999 W. Point Drive               :
Bethlehem, PA 18015            :
           Plaintiffs          :
        v.                    :
JEFFERSON UNIVERSITY HOSPITALS, :
INC. d/b/a JEFFERSON HEALTH      :
111 South 11th Street             :
Philadelphia, PA 19107         :   CIVIL ACTION NO:
and                           :
LEHIGH VALLEY HEALTH NETWORK, :
2100 Mack Blvd.               :
Allentown, PA 18103            :
         and               :   JURY TRIAL DEMANDED
LEHIGH VALLEY HEALTH NETWORK :
CEDAR CREST HOSPITAL        :
1200 S. CEDAR CREST BLVD.      :
Allentown, PA 18103            :
         and               :
LEHIGH VALLEY CARDIOLOGY    :
2649 Schoenersville Road, Suite 301   :
Bethlehem, PA 18017            :
         and               :
CARDIAC DIAGNOSTIC CENTER at  :
LEHIGH VALLEY HOSPITAL       :
MUHLENBERG                 :
2649 Schoenersville Road, Suite 303   :
Bethlehem, PA 18017            :
         and               :
ABBOTT LABORATORIES, INC. AKA  :
ABBOTT LABORATORIES AKA     :
ST. JUDE MEDICAL, INC.         :
100 Abbott Park Road           :
Abbott Park, IL 60064          :
         and               :
DANIEL J. MAKOWSKI, DO      :
LVPG Cardiology              :
2649 Schoenersville Road, Suite 301   :

1

Bethlehem, PA 18017                          :
     and                                    :
ALISON L. WAND, MD                           :
LVPG Cardiology                              :
2649 Schoenersville Road, Suite 301          :
Bethlehem, PA 18017                          :

## CIVIL ACTION – COMPLAINT

NOW COMES, Plaintiff, the executor Laurie Flood on behalf of the Estate of Regina Flood, (hereinafter, referred to as "Plaintiff"), by and through her undersigned counsel, Joseph F. Leeson, III, Esquire of the law firm Leeson & Leeson, and respectfully files this Complaint against Jefferson University Hospitals, Inc. d/b/a Jefferson Health (hereinafter "Jefferson Health"), Lehigh Valley Health Network (hereinafter "LVHN" or "Defendant LVHN"), Lehigh Valley Health Network Cedar Crest Hospital (hereinafter "Cedar Crest"), Lehigh Valley Cardiology (hereinafter, "LVHN Cardiology"), and Cardiac Diagnostic Center At Lehigh Valley Hospital Muhlenberg (hereinafter, "LVHN Cardiac Diagnostic Center") and Abbott Laboratories aka St. Judes Medical, Inc. (hereinafter "Abbott") and Daniel J. Makowski, DO and Alison L. Wand, MD in support thereof avers as follows:

## I.  THE PARTIES

1.      The deceased, Regina Flood was an adult individual and at all times relevant hereto a citizen and resident of the Commonwealth of Pennsylvania with an address located at 4445 Kohler Drive, Lower Macungie Township, Lehigh County, Pennsylvania, 18103.

2.      Plaintiff, Laurie Flood (hereinafter, "Plaintiff" or "Ms. Flood"), is an adult individual and at all times relevant hereto is a citizen and resident of the Commonwealth of Pennsylvania presently residing at 1999 West Point Drive, Bethlehem, Northampton County, Pennsylvania, 18015.

3.      Defendant Jefferson University Hospitals, Inc. d/b/a Jefferson Health is a multi-state, non-profit health system and at all relevant times hereto, a corporation or other jural entity, organized and existing under and by the virtue of the laws of the Commonwealth of Pennsylvania and with a business address at 111 South 11th Street, Philadelphia, PA 19107.

4.      Defendant, Lehigh Valley Health Network (hereinafter "LVHN") (also trading and doing business as Lehigh Valley Hospital – Muhlenberg, Lehigh Valley Hospital – Cedar Crest, Lehigh Vally Hospital – Hecktown/Oaks) was at all times relevant hereto, a corporation or other jural entity, organized and existing under and by the virtue of the laws of the Commonwealth of Pennsylvania, and with a business address at 1503 N. Cedar Crest, Allentown, Pennsylvania 18103.

5.      Defendant, Lehigh Valley Health Network – Cedar Crest Hospital is a medical facility located at 1200 S. Cedar Crest Blvd., Allentown, PA 18103 and is owned and/or operated by Lehigh Valley Health Network.  At all times relevant hereto, it provided medical care and services to Plaintiff and functioned as an agent and/or affiliate of Lehigh Valley Health Network.

6.      Defendant, Lehigh Valley Cardiology is a medical facility located at 2649 Schoenersville Road, Suite 301 Bethlehem, PA 18017 and is owned and/or operated by Lehigh Valley Health Network.  At all times relevant hereto, it provided medical care and services to Plaintiff and functioned as an agent and/or affiliate of Lehigh Valley Health Network.

7.      Defendant, Cardiac Diagnostic Center at Lehigh Valley Hospital Muhlenberg is a medical facility located at 2649 Schoenersville Road, Suite 303 Bethlehem, PA 18017. At all times relevant hereto, it provided medical care and services to Plaintiff and functioned as an agent and/or affiliate of Lehigh Valley Health Network.

8.      Defendant, Abbott Laboratories is a corporation with a primary address at 100 Abbott Park Road, Abbott Park, Illinois 60064, which regularly conducts business in the Commonwealth of Pennsylvania. St. Judes Medical was medical device corporation specializing in cardiovascular and neuromodulation products, that was acquired by Abbott Laboratories in January 2017.

9.      Defendant, Daniel J. Makowski, DO, was at all times relevant hereto a Lehigh Valley Health Network physician practicing at LVPG Cardiology, operating under and by virtue of the laws of the Commonwealth of Pennsylvania, and with a business address at 2649 Schoenersville Road, Suite 301, Bethlehem, PA 18017.

10.     Defendant, Alison L. Wand, MD, was at all times relevant hereto a Lehigh Valley Health Network physician practicing at LVPG Cardiology, operating under and by virtue of the laws of the Commonwealth of Pennsylvania, and with a business address at 2649 Schoenersville Road, Suite 301, Bethlehem, PA 18017.

11.     The claims asserted against Defendant Jefferson Health are for professional negligence as well as the torts of its agents, ostensible agents, servants, and/or employees, as stated more fully herein, as well as for corporate (direct) torts.

12.     The claims asserted against Defendant LVHN are for professional negligence as well as the torts of its agents, ostensible agents, servants, and/or employees involved in the care and treatment of the Plaintiff, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, as stated more fully herein, as well as for corporate (direct) torts.

13.     The claims asserted against Defendant Lehigh Valley Health Network – Cedar Crest Hospital are for professional negligence as well as the torts of its agents, ostensible agents, servants, and/or employees as stated more fully herein, as well as for corporate (direct) torts.

4

14.    The claims asserted against Lehigh Valley Cardiology are for professional negligence as well as the torts of its agents, ostensible agents, servants, and/or employees, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, as stated more fully herein, as well as for corporate (direct) torts.

15.    The claims asserted against Cardiac Diagnostic Center at Lehigh Valley Hospital Muhlenberg are for professional negligence as well as the torts of its agents, ostensible agents, servants, and/or employees as stated more fully herein, as well as for corporate (direct) torts.

16.    The claims asserted against Abbott Laboratories are in the form of product liability specifically as it related to Abbott's Trifecta Glide Tech Valve, model/cat number TFGT-21A, serial number 17560361.

17.    The claims asserted against Defendant, Daniel J. Makowski, DO, are for professional negligence as well as intentional and unintentional torts, as stated more fully herein.

18.    The claims asserted against Defendant, Alison L. Wand, MD are for professional negligence as well as intentional and unintentional torts, as stated more fully herein.

19.    The injuries suffered by Plaintiff that are the subject of this Complaint were caused solely by the intentional acts, negligence and/or recklessness of Defendants and were due in no manner whatsoever to any act, failure to act or omission on the part of Plaintiff.

## II. JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) excluding interest and costs and there is complete diversity of citizenship between Plaintiff and Defendant.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred within the Eastern District of Pennsylvania, including the implantation of the subject medical device, subsequent medical treatment, and the decedent's injuries and death.

### III. FACTUAL BACKGROUND

22.     Plaintiff Regina R. Flood was a 72-year-old woman who underwent surgical implantation of a bioprosthetic aortic valve — the Abbott Trifecta Heart Valve (or a model thereof) — to address her diseased native aortic valve.

23.     Abbott is a multinational medical device and health care company that wholly acquired St. Jude on or about January 4, 2017 (Abbott and St. Jude are collectively referred to below as "Abbott").

24.     The Trifecta and Trifecta GT valves are Class III medical devices manufactured by Abbott Laboratories, Inc. and approved for commercial distribution by the U.S. Food and Drug Administration ("FDA") through Premarket Approval No. P100029 (original approval Apr. 20, 2011; Trifecta GT supplement S033 & S035, 2016–2018).

25.     The Trifecta Valve with Glide Technology (model TFGT-21A) was warranted to last fifteen to twenty years.

26.     As conditions of PMA approval, Abbott was required by federal law and regulation, including 21 U.S.C. § 360e and 21 C.F.R. Parts 803 and 814, to:

    a.  manufacture the devices in conformity with the FDA-approved design and process specifications;

    b.  submit timely Medical Device Reports (MDRs) of any known or suspected device-related deaths, serious injuries, or malfunctions (§ 803.50);

    c.   file supplemental PMA submissions for any design, material, or process change that could affect safety or effectiveness (§ 814.39); and

    d.   conduct post-market surveillance and report any information suggesting that the device failed to meet performance expectations.

27.    On April 20, 2011, the Federal Food and Drug Administration ("FDA") approved the commercial distribution of the St Judes Medical Family of Trifecta Valves manufactured by St. Judes (acquired later manufactured by Abbott).

**A. The Regulatory Framework**

28.    The FDA's initial approval letter to the Abbott Medical family of Trifecta valves states that "The sale, distribution and use of this device are restricted to prescription use in accordance with 21 C.F .R. 801.109[.]" Subsections ( c) and ( d) of § 801.109 provide as follows:

> "( c) Labeling on or within the package from which the device is to dispensed bears information for use, including indications, effects, routes, methods, and frequency and duration of administration, **and any relevant hazards,** contraindications, side effects, **and precautions** under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it was intended, including all purposes for which it is advertised or represented ....
> (d) Any labeling, as defined in section 201(m) of the act, whether or not it is on or within a package from which the device is to be dispensed, distributed by or on behalf of the manufacturer, packer or distributor of the device, that furnishes or purports to furnish information for use of the device contains adequate information for such use, including indications, effects, routes, methods, and frequency and duration of administration, **and any relevant hazards,** contraindications, side effects, **and precautions** under which practitioners licensed by law to employ the device can use the device safely and for the purpose for which it was intended, including all purposes for which it is advertised or represented ... ". [ emphasis added].

29.    21 C.F.R. §814.39(a) requires that a manufacturer of a medical device submit a supplemental PMA for any proposed labeling changes that affect the safety of the device. Subsection (d) of §814.39 further provides that after the FDA approves a PMA the applicant may put into effect any change in labeling "... to reflect newly acquired information that enhances the

safety of the device ... " before the supplement has been approved, including "labeling changes that add or strengthen a ... warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association." *See* 21 C.F.R. §814.39(d)(l) and (2)(i). These regulatory requirements were mandated by the Conditions of Approval in the approval letter for the St. Jude/Abbott family of devices, but there is no indication that St. Jude/Abbott complied with or took action to supplement its labeling or notify patients such as Mrs. Flood of the specific hazards alleged in this Complaint prior to 2023.

30.    Similarly, the Conditions of Approval issued by the FDA to St. Jude required compliance with 21 C.F.R. §814.82(a)(9) which calls for the submission of an Adverse Reaction Report or Device Defect Report to the FDA within ten days after St. Jude received or acquired knowledge of information concerning "... any adverse reaction ... , injury, ... that is attributable to the device and ... has not been addressed by the device's labeling ..." Other than reports made in 2018 and 2024, there is no other indications that St. Jude/Abott submitted any such report(s) before or after the Trifecta valve device was implanted into Mrs. Flood's body.

31.    Federal regulations also impose on the manufacturer of a medical device such as Abbott/St. Jude certain reporting requirements. 21 C.F.R. §803.1 states that the purpose of the Medical Device Reporting ( MDR ") requirements is to "... help us to protect the public health by helping ensure that devices are not adulterated or misbranded and are safe and effective for their intended use." Section 803.10(c) requires a manufacturer like Abbott to "[s]ubmit reports of individual adverse events no later than thirty (30) calendar days after the day that you become aware of a death, serious injury. or malfunction ..." and to "[s]ubmit supplemental reports if you obtain information that you did not submit in an initial report." Section 803.50 sets forth similar reporting requirements.

32.    21 C.F .R. §806.10 requires a manufacturer like Abbott to submit a report of any correction to a device that is needed to reduce a risk to health posed by the device. 33. 21 C.F.R. §820.198 mandates that each manufacturer such as Abbott "maintain procedures for receiving. reviewing. and evaluating complaints …" and if any complaint represents a reportable adverse event under 21 C.F.R. §803 to communicate with the complainant upon completion of its investigation. Mrs. Flood has never received any such communication from Abbott.

### B.  Violations of FDA Requirements by Abbott

33.    The Trifecta valve was approved by the U.S. Food and Drug Administration ("FDA") as a Class III surgical aortic bioprosthetic valve — a valve constructed of bovine pericardial tissue mounted (externally) onto a stented frame.

34.    The first Trifecta was inserted in Wellington in 2012 with ongoing use until July 2020.

35.    Beginning no later than 2018, Abbott received internal data and adverse-event reports demonstrating an abnormally high incidence of early structural valve deterioration (SVD)—defined as tearing, calcification, or leaflet detachment within five years of implant—far exceeding the durability represented to the FDA during PMA review and to physicians through labeling and marketing.

36.    In the 2018 to 2019 period, there was a cluster of seven Trifecta valves that had returned with SVD requiring reintervention raising concerns about their early failure.

37.    Between 2011 and 2018, Abbott Laboratories, Inc. and its predecessor St. Jude Medical, Inc. had received, or in the exercise of reasonable diligence should have received, information indicating that the Trifecta and Trifecta GT bioprosthetic aortic valves were exhibiting

rates of early structural valve deterioration (SVD) significantly higher than expected for similar Class III heart valves.

38.     Data from multiple clinical centers, including a retrospective analysis conducted between 2011 and 2015, revealed that 13.3% of patients implanted with Trifecta valves developed SVD, compared to only 4.6% among patients receiving non-Trifecta valves over a similar time frame — a nearly threefold increase in failure rate. Such findings directly contradicted the device's marketed representations regarding long-term durability and should have triggered Medical Device Reports (MDRs) and/or supplemental PMA submissions under 21 C.F.R. §§ 803.50 and 814.39.

39.     By 2017, additional post-market evidence emerged demonstrating that the Trifecta and Trifecta GT valves were failing due to mechanical defects — including cusp tears, leaflet dehiscence, and aortic regurgitation — in as little as two to three years post-implantation. A New Zealand cardiac center published a review of 263 Trifecta valve recipients, identifying at least three failures requiring surgical reintervention within just three years. One of those failures involved a Trifecta GT valve, which had been marketed as an "improved" model.

40.     These early failures involved failure modes such as leaflet tearing — a mechanism not previously included in the device's labeling or addressed in its PMA documentation. The occurrence of such events within this timeframe met the criteria for "serious injury" and "malfunction" under 21 C.F.R. § 803.3, and thus required reporting to the FDA within thirty (30) days of awareness. Abbott failed to timely submit such reports.

41.     Moreover, prior to 2019, regulatory authorities outside the United States — including the United Kingdom's Medicines and Healthcare products Regulatory Agency (MHRA)

— had received and documented dozens of adverse incident reports involving both Trifecta and Trifecta GT valves.

42.    Under FDA's regulatory framework, a manufacturer's awareness of adverse events reported in international markets constitutes "information" triggering domestic reporting obligations. Abbott, however, made no known attempt to alert the FDA or amend its labeling to reflect these international findings prior to 2019.

43.    At no point prior to 2019 did Abbott Laboratories or St. Jude Medical file a supplemental PMA to update the labeling, warnings, or safety information associated with the Trifecta valve family, despite accumulating evidence of a known or foreseeable risk of early valve failure. Federal law, including 21 C.F.R. § 814.39(d), authorizes — and in some cases requires — a device manufacturer to unilaterally amend labeling to add or strengthen warnings related to newly acquired information affecting safety or effectiveness, even before FDA approves a formal supplement. Abbott failed to avail itself of this mechanism, despite actual or constructive knowledge of the deteriorating safety profile of its heart valves.

44.    Abbott also violated its obligations under the Quality System Regulation (QSR), 21 C.F.R. Part 820, by failing to investigate and act upon internal complaints, adverse outcomes, or device failures indicative of early deterioration. FDA regulations require manufacturers to maintain a complaint handling system, to evaluate any complaint suggesting device malfunction or patient harm, and to initiate corrective action where necessary. There is no evidence that Abbott communicated with affected patients, physicians, or the FDA regarding these adverse events prior to 2019, nor is there evidence that it revised internal risk assessments in light of emerging real-world data.

45.     These failures were typically caused by a known risk associated with the valve's unique design, in which bovine pericardial leaflets are externally mounted to the stent frame. This same externally mounted leaflet design was carried forward into the Trifecta GT (Glide Technology) model, which was marketed by Abbott as a design improvement.

46.     The Trifecta Valve with Glide Technology (GT) was not subject to a new Premarket Approval (PMA) application, nor did it undergo the rigorous, de novo review process typically required for novel high-risk Class III medical devices. Instead, the GT valve was approved by the U.S. Food and Drug Administration (FDA) through a PMA supplement to the original Trifecta valve's approval (PMA #P100029). This regulatory shortcut allowed the device to reach the market based on the assumption that the changes were incremental, not fundamental, and that existing safety and efficacy data from the original Trifecta valve remained applicable.

47.     A PMA supplement is not a fresh approval of a new device, but rather a limited review of changes made to an already approved product. The supplement process begins from the presumption that the original device is safe and effective, and the FDA's inquiry is narrowly confined to whether the proposed modification alters that conclusion. As a result, the agency typically does not require new clinical trials, long-term durability data, or a reassessment of the underlying design unless the manufacturer itself frames the change as fundamentally altering safety or effectiveness. The scope of review is therefore incremental rather than comprehensive, and approval timelines are substantially shorter.

48.     However, this approach overlooked the fact that the original Trifecta valve had already shown signs of premature structural valve deterioration (SVD), including leaflet tears, calcification, pannus formation, and regurgitation — all of which would be mirrored in the GT version. Because the GT was reviewed only as a PMA supplement, no new clinical trials were

required, and no comprehensive reassessment of long-term durability was mandated by the FDA. As a result, known risks with the base design and materials were effectively carried forward, unchecked, into a newly branded product.

49.     Despite minor modifications intended to improve implantability — such as Glide Technology and anti-calcification treatments — the GT valve remained fundamentally the same as the original Trifecta in its material composition, leaflet mounting, and stent structure. Independent studies and post-market surveillance later confirmed that the same failure mechanisms that plagued the original model — particularly leaflet tears at the commissures — also emerged in the GT version, sometimes within just a few years of implantation. In effect, the use of the PMA supplement pathway allowed the manufacturer to reintroduce a flawed design under a new name, without subjecting it to the level of independent scrutiny or clinical testing warranted by its risk profile.

50.     By early 2020, MHRA disclosed it had received at least 65 such reports, including five for Trifecta GT. These reports cited failures occurring between the time of implant and eight years later, with approximately half of the failures emerging within just 2 to 3 years.

51.     On or about July 23, 2020, the United Kingdom's Medicines and Healthcare Products Regulatory Agency (MHRA) issued an official *Medical Device Alert* entitled "Abbott Trifecta/Trifecta GT Bioprosthetic Aortic Heart Valves – Cases of Structural Valve Deterioration." The MHRA disclosed that it had received 65 adverse incident reports involving early structural failure in Trifecta family valves, including 5 known failures involving Trifecta GT models. The reported failures included severe aortic regurgitation, leaflet detachment, and the need for valve-in-valve reoperations or explants — many of which occurred between 2 and 3 years post-implant.

52.    The MHRA alert explicitly noted that the external leaflet mounting design of the Trifecta valve family may have contributed to early failure. The Agency advised enhanced surveillance and cautioned clinicians regarding the valve's performance durability.

53.    Despite these early international warnings and published failures — and despite design continuity between the first-generation Trifecta and the Trifecta GT — Abbott Laboratories continued to promote the Trifecta GT valve in the U.S. as a durable and clinically superior solution for surgical aortic valve replacement, with no warnings to physicians or patients about potential early structural valve deterioration.

54.    At no point prior to February 2023 did Abbott update its labeling, submit a supplemental Premarket Approval (PMA) application under 21 C.F.R. § 814.39(a), or issue any field safety notice in the United States to address these accumulating concerns — even though such warnings were mandated under the Medical Device Reporting (MDR) regulations codified at 21 C.F.R. § 803.50.

55.    In light of accumulating reported adverse events, on February 27, 2023, the U.S. Food and Drug Administration (FDA) issued its first formal safety communication regarding the Trifecta family of valves. In a "Letter to Health Care Providers," the FDA warned of a "potential risk of early structural valve deterioration" and cited "published literature suggesting a higher cumulative incidence of early (five years or less) SVD for Trifecta valves compared to other commercially available surgical bioprosthetic valves."

56.    In the FDA formal safety communication, the "Letter to Health Care Providers," the FDA alerted physicians and other providers to a "potential risk of early structural valve deterioration (SVD)" in the entire Trifecta family (both original Trifecta and Trifecta GT), urging enhanced surveillance: annual echocardiograms beginning one year post-implant, patient

education regarding signs/symptoms of valve dysfunction (e.g., new-onset shortness of breath, fatigue), and prompt reporting of adverse events to FDA.

57.    The FDA noted that "published literature suggests a higher cumulative incidence of early (five years or less) SVD for Trifecta valves compared to other commercially available surgical bioprosthetic valves."

58.    The FDA's communication applied to both the original Trifecta and the Trifecta GT models, confirming that Abbott had failed to take timely regulatory action or provide adequate notice to the FDA or the public, despite known risks of early failure.

59.    On July 31, 2023, Abbott Laboratories voluntarily initiated a market withdrawal of the Trifecta valve product line from the U.S., removing all remaining inventory. While Abbott's withdrawal letter cited a business decision to focus on next-generation products, the timing and accompanying FDA oversight strongly indicate that the withdrawal was linked to the known durability concerns and structural failure risks.

60.    On July 31, 2023, Abbott initiated a U.S. Market Withdrawal for the Trifecta valves which states as follows:

> Dear Valued Customer,
> The purpose of this letter is to inform you that Abbott is initiating a US Market Withdrawal for the Trifecta family of valves (see Table 1 below) and will be removing the limited remaining inventory from the field.
>
> On February 27, 2023, Abbott and the US FDA communicated the potential for early Structural Valve Deterioration (SVD) and provided patient management considerations for those patients implanted with the Trifecta and Trifecta GT valves. The assessment of incidence and risk associated with early SVD has not changed since the February communication. Abbott continues to work closely with the FDA on post-market surveillance associated with prior implants.
>
> Abbott decided to discontinue its Trifecta family of valves to focus on tissue heart valve solutions that maximize possibilities for lifetime management of valvular heart disease. Abbott is initiating inventory related activities world-wide in accordance with respective regulatory frameworks.

61.     These events — documented in peer-reviewed publications, foreign regulatory alerts, and U.S. FDA communications — establish that, well before 2023, Abbott had access to post-market evidence indicating an elevated risk of early failure in Trifecta and Trifecta GT valves. The failure modes (leaflet tears, regurgitation, explant, and death) were predictable based on the valve's structural design, particularly the external mounting of pericardial tissue.

62.     Abbott's failure to act on this information — by failing to update the label, issue warnings, revise the design, submit a PMA supplement, or file required adverse event reports — violated its federal obligations under 21 C.F.R. Parts 803, 814, and 820, and directly breached its parallel duties under Pennsylvania tort law to design, manufacture, and warn in accordance with known safety risks.

63.     The premature failure pattern documented in literature and safety alerts is materially inconsistent with the durability expectations implanted patients (and their physicians) were given when selecting the Trifecta GT as a long-lasting bioprosthetic solution — a misalignment between promised and actual performance.

64.     Despite substantial post-market evidence — including explanted valves showing structural leaflet failure, early need for reoperation, and documented adverse events — Abbott did not issue public warnings to patients or the broader medical community until the February 2023 FDA letter, even though some published reports of early GT failures predated that.

65.     Upon information and belief, many implanting physicians never provided adequate notice that Trifecta GT valves were subject to a materially elevated risk of early SVD, and thus continued to treat postoperative patients under the assumption of long-term structural integrity — potentially delaying detection of valve deterioration.

16

66.     The combination of disclosed published data, FDA safety communications, and Abbott's own market-withdrawal action demonstrates that the risk of early structural failure was known (or reasonably discoverable) well before the recall — yet the information was withheld or unduly delayed from patients and providers, leading to a significant risk of injury or death for individuals with implanted Trifecta GT valves.

67.     These publicly documented failures and data showing early SVD provide strong evidence that the Trifecta GT valve was defectively designed and unreasonably dangerous, undermining Abbott's representations of long-term durability.

68.     The fact that structural deterioration occurred well within five years (and as early as under two years) contradicts the expected performance life of a long-term bioprosthetic valve and supports claims of design/manufacturing defect and breach of warranty.

69.     These facts also underpin a regulatory-violation (parallel claim) theory, showing that Abbott failed to meet post-market obligations (reporting, labeling changes, corrective action) required under FDA regulation after discovering increased risk — which can be translated into state-law negligence per se or strict liability, without requiring a claim of "fraud-on-the-FDA."

70.     Despite possessing that information, Abbott failed to file required MDRs within the thirty-day reporting window and did not submit a supplemental PMA seeking FDA approval for design or labeling changes to address the elevated SVD risk, as mandated by 21 C.F.R. § 814.39(a).

71.     Abbott's omissions violated the same federal requirements imposed under its PMA and the Medical Device Reporting regulations. Had Abbott complied with those duties, the FDA would have required corrective actions, safety communications, or labeling changes warning of premature failure, which would have prevented or mitigated Plaintiff's injury.

72.    Abbott's conduct also violated federal Current Good Manufacturing Practices (21 C.F.R. Part 820) by failing to maintain adequate procedures for complaint handling, corrective and preventive action, and quality assurance concerning valve durability.

73.    Plaintiff's claims do not seek to impose state-law requirements different from or in addition to federal law but instead rest on parallel state-law duties—to design, manufacture, and warn in accordance with federal safety obligations. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) (allowing parallel-claim exception); *Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. 2013) (en banc) (failure-to-report MDR information is parallel claim).

74.    Accordingly, Abbott's failures to comply with its PMA-imposed duties constitute negligence per se, strict-liability design and manufacturing defects, and failure to warn, actionable under Pennsylvania law and not preempted by 21 U.S.C. § 360k.

75.    Abbott's withdrawn Trifecta valves with early SVD implicated and violated Federal Regulations, including, but not limited to:

        a.    21 CFR 803-Medical Device Reporting;

        b.    21 CFR 814-Premarket Approval of Medical Devices; and

        c.    21 CFR 820-Quality System Regulation

(collectively the "Federal Regulations").

76.    Pursuant to 21 CFR 814.82(c), Abbott's failure to comply with post-approval reporting requirements in the Federal Regulations with regard to the known early SVD defect in the Trifecta valves, coupled with its total market withdrawal of the product, are sufficient grounds for withdrawal of the Premarket Approval of this product.

77.    Upon information and belief, Abbott knew or should have known from available clinical data that the Trifecta valve was prone to early SVD prior to 2019 and yet failed to report the defect to the FDA or withdraw the product until 2023, in violation of the Federal Regulations.

78.    Plaintiff's claims of are based upon the early SVD of the Trifecta valves and related defects as publicly recognized by Abbott and the FDA and Plaintiff's claims are parallel to and premised upon Abbott's violation of Federal Regulations and do not impose state law requirements different from, or in addition to, federal requirements.

79.    The plaintiff further alleges that the Defendant, Abbott, acted in willful, wanton, gross and in total disregard for the health and safety of the user or consumer of its Trifecta and Trifecta GT medical devices, including plaintiff, acted to serve their own interest and having reason to know and consciously disregard the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, and consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

### C. Mrs. Flood's Experience with the Device

80.    For decedent Regina Flood — who was implanted with a Trifecta GT in November 2019 and later suffered catastrophic valve dysfunction consistent with known SVD patterns — the publicly documented failure mode, known risk history, and delayed disclosure are directly relevant to causation, notice, and defective-product design/marketing theories.

81.    On or about November 20, 2019, Plaintiff Regina Flood received a Trifecta GT Tissue Heart Valve, Model Number TFGT-21A (the "Trifecta valve") during a surgery in Allentown, Lehigh County, Pennsylvania at Lehigh Valley Hospital. Abbott's internal and

publicly reported MDR data show that similar failures occurred with a peak incidence between three and four years post-implant, resulting in reoperations and deaths.

82.     Decedent Regina R. Flood was a 76-year-old who began experiencing progressive cardiac symptoms in the fall of 2023, including shortness of breath, exertional fatigue, chest discomfort, and reduced exercise tolerance — classic indicators of prosthetic valve dysfunction.

83.     On or about October 2, 2023, Plaintiff Regina Flood was seen in the Emergency Department of Lehigh Valley Hospital – Cedar Crest with a chief complaint of chest pain and diagnosed with NSTEMI (non-ST elevated myocardial infarction) and admitted after an Echocardiogram performed at bedside showed a low LVEF (left ventricular ejection fraction, a key measurement used to assess heart function).  She was discharged on October 5, 2023 with instructions to follow up with Daniel J. Makowsky, DO on October 23, 2023.

84.     On October 23, 2023, Mrs. Flood was seen by cardiologist Daniel J. Makowski, DO, for follow up to recent hospitalization on October, 2, 2023, who documented the emergence of fluttering, progressive dyspnea with lightheadedness. Despite these findings, as well as an assessment of aortic stenosis status post bioprosthetic AVR (St. Jude 21 mm Trifecta bioprosthesis) no urgent cardiac studies were ordered, and no referral was made for expedited evaluation by a valve team or interventional cardiology but was advised to follow up with Dr. Makowski in six (6) months.

85.     On November 4, 2023, Plaintiff Regina Flood, once again presented to Lehigh Valley Hospital with a new onset of chest pain with radiation to bilateral arms.  She was discharged on November 6, 2023, with a discharge diagnosis of New-Onset Angina and advised to follow up with her cardiologist, Daniel J. Makowski, DO, in one (1) month.

86.    On November 27, 2023, Regina Flood once again presented to Lehigh Valley Hospital – Cedar Crest with complaints of worsening chest pain and shortness of breath over the past 3 days culminating today with crushing chest pain behind her sternum radiating to her left shoulder and left jaw and is admitted after EKG noted changes.

87.    On November 28, 2023, Mrs. Flood underwent a cardiac catheterization was performed with stent placed, and echocardiogram was performed which showed Severe Aortic Stenosis status post bioprosthetic AVR (aortic valve replacement). Despite these findings and her repeated visits to the Emergency Departments with admissions, she was discharged on December 1, 2023 by Alison L. Wand, MD with instructions to follow up as an outpatient for evaluation for TAVR ( Transcatheter Aortic Valve Replacement) and with her cardiologist, Daniel J. Makowski, DO.

88.    Mrs. Flood followed up with Daniel J. Makowski, DO on December 4, 2023, with continuing complaints of chest pain and shortness of breath and despite a review of the November 29, 2023 echocardiogram showing her aortic valve gradients elevated into the severe range, Dr. Mankowski advised Mrs. Flood to follow up in one (1) month for a repeat echocardiogram and provided a referral to the TVAR clinic to discuss the potential for valve replacement surgery.

89.    On December 18, 2023, Plaintiff Regina Flood presented to Lehigh Valley Hospital – Cedar Crest with complaints of chest pain and shortness of breath on exertion. Upon Admission an echocardiogram was performed that showed severe prosthetic aortic stenosis and severe aortic insufficiency.

90.    On December 20, 2023, Mrs. Flood was evaluated by LVPG Cardiac & Thoracic Surgery with a plan for TAVR the following day, Friday, December 21, 2023, however due to

insufficient anesthesiology staffing, the procedure was rescheduled for the following day, December 22, 2023.

91.    On the evening of December 21, 2023, Plaintiff Regina Flood was complaining of crushing substernal chest pain and shortness of breath and suffered cardiac arrest. She was intubated and transferred to CICU.

92.    Plaintiff, Regina Flood, never regained consciousness and passed at 1:02 p.m. on December 22, 2023.

93.    Despite the growing evidence of cardiac decompensation, there was no timely referral for transthoracic echocardiography, no urgent diagnostic imaging ordered, and no steps taken to initiate transcatheter aortic valve replacement (TAVR) evaluation or surgical re-intervention, which were medically indicated given her clinical status and history.

94.    The hospital, LVHN, failed to provide adequate anesthesiology staffing. The anesthesiology department was unavailable or insufficiently staffed, rendering the hospital unable to perform the planned surgery.

95.    Because of this staffing deficiency, the procedure was delayed by at least one day. During this delay, Ms. Flood — reliant on the failing prosthetic valve to maintain hemodynamic stability — experienced a fatal cardiac decompensation and died before corrective surgery could be performed.

96.    Mrs. Flood suffered a pulseless electrical activity (PEA) cardiac arrest on December 21, 2023, requiring ten minutes of resuscitation, intubation, and critical care. She remained in intensive care until her death on December 22, 2023.

97.    The Autopsy Report, dated December 28, 2023, confirmed that Mrs. Flood died as a result of severe aortic stenosis due to calcific degeneration of her bioprosthetic heart valve. No

thrombus, infection, vegetation, or alternate cause of death was identified. The autopsy further revealed significant four-chamber cardiac enlargement, consistent with long-standing pressure overload.

98.     Had Mrs. Flood's condition been recognized in a timely manner, she would have been a candidate for elective valve-in-valve TAVR or surgical revision, which would likely have prevented the hemodynamic collapse that resulted in her cardiac arrest and death. Her death was foreseeable and preventable.

99.     As a direct and proximate result of the negligent acts and omissions of her treating providers — including but not limited to the failure to diagnose bioprosthetic valve failure, failure to escalate care, and delay in life-saving intervention — Regina Flood suffered catastrophic cardiac decompensation and death.

100.    Nearly ten months prior to Regina Flood's death, the U.S. Food and Drug Administration had issued a formal Letter to Health Care Providers specifically warning that the Trifecta family of bioprosthetic aortic valves—including both the original Trifecta and the Trifecta Valve with Glide Technology—posed a "potential risk of early structural valve deterioration (SVD)." The FDA expressly cited published medical literature demonstrating a higher cumulative incidence of early SVD—within five years or less—when compared to other commercially available surgical bioprosthetic valves, thereby placing hospitals and treating providers on clear and unequivocal notice that these devices were prone to premature failure well before the expected lifespan of a surgical tissue valve.

101.    The FDA's safety communication did not merely identify a generalized risk; it imposed specific patient-management expectations on hospitals and providers responsible for patients implanted with Trifecta valves. The FDA urged enhanced surveillance, including annual

23

echocardiographic monitoring beginning one year post-implant, proactive patient education regarding warning signs of valve dysfunction—such as new or worsening shortness of breath, fatigue, or reduced exercise tolerance—and prompt clinical evaluation and reporting of suspected valve deterioration. These directives reflected the FDA's recognition that early SVD could manifest subtly but progress rapidly, requiring vigilant monitoring and timely intervention to prevent catastrophic outcomes.

102.    By issuing this warning, the FDA confirmed that durability concerns were sufficiently established in the medical literature and post-market data to warrant immediate action by hospitals and treating clinicians. From that date forward, the hospital defendants knew or should have known that patients implanted with the Trifecta family of valves faced a foreseeable risk of malfunction within two to three years, necessitating heightened clinical vigilance.

103.    Despite this clear notice, the hospital defendants failed to adhere to the enhanced monitoring and diagnostic standards articulated by the FDA. The plaintiff exhibited clinical and diagnostic signs consistent with developing prosthetic valve stenosis, a well-recognized manifestation of early structural valve deterioration in Trifecta valves, including progressive narrowing of the valve orifice due to leaflet thickening, calcification, or impaired leaflet motion. These findings were consistent with the very failure mechanisms identified in the FDA's warning and in the peer-reviewed literature cited therein.

104.    The hospital defendants were aware, or in the exercise of reasonable medical care should have been aware, that stenosis in a Trifecta valve—particularly within the early post-implant period—was a red-flag indicator of device failure, not routine valve aging. Nonetheless, they failed to timely diagnose the defective valve condition, failed to escalate care, and failed to intervene when intervention could have prevented further deterioration and harm.

This delay deprived the plaintiff of the opportunity for earlier corrective treatment, including valve replacement or other appropriate intervention, before the valve reached a critical and life-threatening state.

105.    The hospital defendants' failure to act occurred against the backdrop of escalating regulatory concern. On July 31, 2023, Abbott Laboratories initiated a voluntary market withdrawal of the entire Trifecta valve product line from the United States, removing all remaining inventory from clinical use. Although Abbott characterized the withdrawal as a business decision, its own correspondence acknowledged the FDA's February 2023 warning and reaffirmed the ongoing assessment of early SVD risk. The withdrawal—coordinated with FDA oversight—further confirmed that the Trifecta family of valves suffered from recognized durability and structural failure issues, reinforcing the obligation of hospitals to closely monitor implanted patients and promptly respond to signs of valve dysfunction.

106.    The publicly disclosed concerns and recall of the Trifecta valve establish that, even at the time of Ms. Flood's 2023 hospitalization, there was a known risk profile for early deterioration and failure. The combination of her clinical history, prosthetic valve status, and the diagnostic data (narrowed valve area, low output, reduced EF, wall-motion abnormalities) should have prompted a full assessment for prosthetic valve failure rather than solely attributing her presentation to coronary artery disease.

107.    Critically, the hospital noted she had severe stenosis of her bioprosthetic aortic valve, a condition that impairs forward blood flow and significantly increases cardiac workload. Despite prior placement of a surgical bioprosthetic valve (likely a Trifecta model or its variant), the replacement valve had once again developed stenosis and regurgitation, indicating structural valve deterioration (SVD).

108.    At all times relevant, Defendants (hospital, cardiology team, surgical team) had actual or constructive knowledge of Ms. Flood's prosthetic valve status, the risk of structural deterioration inherent in her valve model (or at least had a duty to evaluate the possibility), and her unstable cardiac condition warranting immediate, not elective, surgical intervention.

109.    Nonetheless, Defendants failed to conduct an appropriate evaluation for prosthetic valve failure, failed to treat the underlying (but identifiable) condition in a timely manner, and then — once surgery was scheduled — failed to ensure required staffing for the emergency procedure. The combination of these failures — failure to diagnose, failure to treat, and inadequate procedural staffing — caused or contributed to Ms. Flood's preventable death.

<u>**COUNT I**</u>

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
All Defendants
**WRONGFUL DEATH ACTION
PURSUANT TO 42 PA.C.S.A. § 8301**

110.    The paragraphs above are incorporated herein by reference.

111.    Plaintiff brings this action as the daughter and personal representative of the Decedent's Estate on behalf of herself, other statutory beneficiaries and the estate pursuant to 42 Pa.C.S.A. § 8301.

112.    The Decedent's death was directly and proximately caused by the reckless, wanton, willful, intentional and malicious actions of the Defendant in some, or all, of the following particulars,

113.    As a direct and proximate result of the Decedent's death, the Plaintiff has lost the past, present, and future services and companionship of her mother, including, but not limited to, company, affection and aid in the maternal relationship.

114.    As a direct and proximate result of the Decedent's death, Plaintiff has incurred certain medical expenses, funeral expenses, and the estate has incurred administration expenses that Plaintiff is entitled to recover.

115.    The persons entitled to recover damages for Wrongful Death are as follows:

   a.  Regina Flood, daughter of the decedent, presently residing in Northampton County, Pennsylvania.

   b.  John Flood, son of the decedent, presently residing in Lehigh County, Pennsylvania.

116.    Plaintiff is entitled by law to recover for the following damages:

   a.  Medical services and supplies incident to the treatment and subsequent death of the Decedent;

   b.  Funeral and estate expenses because of the death of the Decedent;

   c.  Plaintiff has been denied and has forever lost the services, assistance, counseling, care, comfort, companionship, society, consortium, guidance, tutelage and society of the Decedent;

   d.  Plaintiff has been deprived of the financial support and pecuniary benefits which she would have received from the Decedent;

   e.  Plaintiff has incurred the expenses of administration of the Decedent's Estate;

   f.  Punitive damages; and

   g.  Other losses and damages recoverable by law.

117.    As a direct and proximate result of the Defendant's tortious, malicious and reckless conduct, as described above, the Defendant is liable for the damages as set forth above.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and punitive damages for an amount in excess of SEVENTY-FIVE THOUSAND and 00/100 dollars ($75,000).

## COUNT II

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ABBOTT LABORATORIES, INC. AKA
ABBOTT LABORATORIES AKA
ST. JUDE MEDICAL, INC.
**SURVIVAL ACTION -
STRICT LIABILITY (MANUFACTURING/ DESIGN DEFECT)**

118.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

119.    The Abbott Trifecta GT Heart Valve implanted in Regina Flood on or about November 20, 2019, was a Class III medical device subject to FDA Premarket Approval under PMA No. P100029, including relevant supplements (S033 and S035) approved between 2016–2018.

120.    As a condition of continued market approval, Abbott Laboratories was legally required to comply with post-market federal regulatory obligations, including but not limited to:

a.    Timely submission of Medical Device Reports (MDRs) for known or suspected device-related deaths, injuries, or malfunctions under 21 C.F.R. § 803.50;

b.    Submission of PMA Supplements for any change to the device, materials, or manufacturing process that could affect the device's safety or effectiveness under 21 C.F.R. § 814.39(a);

c.    Execution of appropriate corrective and preventive actions (CAPA) under 21 C.F.R. § 820.100, and;

28

d.  Implementation of robust complaint-handling and post-market surveillance systems under 21 C.F.R. § 820.198 and § 822.21.

121.    At the time of Plaintiff's implantation, and certainly prior to Ms. Flood's death, Abbott was aware — through internal adverse event reports, international registry data, and clinical studies — of a significantly increased risk of early Structural Valve Deterioration (SVD), including leaflet tears, calcification, and premature failure of Trifecta and Trifecta GT valves well within five years of implantation.

122.    Despite this knowledge, Abbott failed to submit timely MDRs as required by federal law and failed to seek PMA supplement approval to modify the device labeling, warnings, or materials to reflect the known SVD risk, as required under 21 C.F.R. § 814.39(a).

123.    These omissions deprived the FDA, the medical community, and patients — including Regina Flood — of critical safety information that would have altered the risk-benefit profile of the device and led to different clinical decisions.

124.    Plaintiff avers that Abbott's conduct constitutes a violation of federal law and of corresponding parallel state-law duties under Pennsylvania law to design, manufacture, and warn of dangerous defects in medical devices.

125.    Plaintiff specifically pleads that Abbott's actions and omissions are actionable under Pennsylvania law pursuant to the parallel claims doctrine, and thus are not preempted by 21 U.S.C. § 360k or the holding in Riegel v. Medtronic, Inc., 552 U.S. 312 (2008), because they do not impose duties "different from or in addition to" those required under federal law, but rather are grounded in identical federal requirements.

126.     The premature failure of the Trifecta GT valve in Ms. Flood — occurring within approximately four years of implantation and consistent with known early-SVD failure modes — was the direct result of Abbott's violation of its federal and state duties.

127.     Accordingly, the Trifecta GT valve implanted in Ms. Flood was defective in design and unreasonably dangerous for its intended use under Pennsylvania law, and its placement into the stream of commerce constitutes a breach of strict liability principles.

### COUNT III

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ABBOTT LABORATORIES, INC. AKA
ABBOTT LABORATORIES AKA
ST. JUDE MEDICAL, INC.
**SURVIVAL ACTION -**
**NEGLIGENCE PER SE (FDA VIOLATIONS)**

128.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

129.     Abbott Laboratories, as the manufacturer of the Trifecta GT valve, owed a legal duty under both federal law and Pennsylvania tort law to ensure that the device it sold and promoted was safe, effective, and compliant with all regulatory post-market obligations.

130.     Abbott breached that duty by violating federal regulations, including but not limited to:

   o   21 C.F.R. § 803.50 – failing to report known serious adverse events (early SVD, valve failure) in timely MDRs;

   o   21 C.F.R. § 814.39(a) – failing to file a PMA Supplement when material deterioration and performance deviations emerged;

   o   21 C.F.R. § 820.198 – failing to maintain adequate complaint-handling procedures; and

o    21 C.F.R. § 820.100 – failing to take corrective action when known failures arose

in the field.

131.    The violations of these federal safety regulations, which are expressly intended to

protect patients like Ms. Flood, establish negligence per se under Pennsylvania law.

132.    Ms. Flood suffered injuries — including cardiac decompensation and death — that

were the direct and foreseeable consequence of Abbott's failure to report, investigate, warn of, or

correct the early SVD risk associated with the Trifecta GT valve.

133.    Had Abbott complied with its legal obligations, the device would have been subject

to additional FDA review, potentially withdrawn earlier, or its labeling changed to reflect the true

risk of early SVD — thereby preventing implantation in Ms. Flood or ensuring earlier clinical

recognition of valve deterioration.

134.    Plaintiff's claim of negligence per se is based solely on the violation of federal

regulatory requirements that parallel state-law duties, and does not rely on any cause of action

created solely by the FDCA or allege fraud-on-the-FDA, in accord with Buckman Co. v. Plaintiffs'

Legal Comm., 531 U.S. 341 (2001).

## COUNT IV

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ABBOTT LABORATORIES, INC. AKA
ABBOTT LABORATORIES AKA
ST. JUDE MEDICAL, INC.
**SURVIVAL ACTION – FAILURE TO WARN**

135.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

136.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. §

8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

137.    Abbott Laboratories, as successor to St. Jude Medical, manufactured, marketed, and distributed the Trifecta GT valve (Model TFGT-21A) pursuant to an FDA Premarket Approval (PMA) under 21 U.S.C. § 360e and 21 C.F.R. Part 814.

138.    Under Pennsylvania law, Abbott owed a continuing duty to warn patients and healthcare providers of known or reasonably foreseeable risks associated with its device, including through post-sale communications, labeling updates, and FDA-mandated reporting.

139.    Simultaneously, under federal law—including 21 C.F.R. §§ 814.39(d), 803.50(a), 814.82(a)(9), and 814.84—Abbott had ongoing obligations to:

a.    Submit timely Medical Device Reports (MDRs) upon receiving or becoming aware of information suggesting that the device may have caused or contributed to a death or serious injury;

b.    File a PMA supplement or labeling amendment upon receipt of "newly acquired information" demonstrating a risk requiring strengthened warnings;

c.    Report unanticipated adverse events and increases in expected adverse events within 10 days of acquiring such information;

d.    Revise product labeling when necessary to ensure the device remains safe and effective under 21 C.F.R. § 814.39(d)(1)-(2)(i).

2.    Beginning as early as 2018, Abbott possessed or had access to post-market data—including internal device failure reports, international adverse event reports, peer-reviewed studies, and explanted valve analyses—indicating a significantly elevated risk of early structural valve deterioration (SVD) in the Trifecta and Trifecta GT devices.

3.    Despite having actual or constructive knowledge of this risk, Abbott failed to:

a.  File a PMA supplement to update the device's labeling;

b.  Issue strengthened or clarifying warnings to healthcare providers;

c.  Notify the FDA of serious adverse events via MDRs in a timely manner;

d.  Notify or warn implanting physicians or patients, including Ms. Flood and her treating providers, of the elevated risk of early failure.

140.    These omissions directly violated Abbott's federal duties under the PMA approval conditions and regulations and, independently, breached its state-law duty under Pennsylvania law to provide timely and adequate warnings regarding newly discovered hazards.

141.    The FDA expressly permits manufacturers, under 21 C.F.R. § 814.39(d), to unilaterally strengthen warnings upon receiving new safety information, without awaiting prior FDA approval. Abbott failed to exercise this authority, despite evidence of serious and life-threatening device failures.

142.    The duty to report adverse events and update warnings imposed by these federal regulations parallels—rather than adds to—state tort duties. Therefore, Plaintiff's failure-to-warn claims are based on "parallel" duties and are not preempted under *Riegel v. Medtronic*, 552 U.S. 312 (2008), or *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).

143.    Abbott's failure to report serious adverse events and failure to strengthen warnings regarding early SVD deprived implanting physicians of critical information necessary to:

144.    Make informed device selection decisions;

145.    Monitor patients such as Ms. Flood appropriately post-implant;

146.    Initiate timely diagnostic testing or reintervention when signs of valve failure emerged.

147.    Had Abbott fulfilled its federal and corresponding state-law obligations, Ms. Flood's physicians would have been on notice to consider prosthetic valve failure in the differential diagnosis, to pursue aggressive workup when she presented with recurrent symptoms, and to expedite definitive intervention before her cardiac decompensation.

148.    As a direct and proximate result of Abbott's failure to warn, Ms. Flood's bioprosthetic valve failure went undetected and untreated until it culminated in cardiac arrest and death.

149.    Abbott's conduct constitutes both:

a.    Negligent failure to warn, under Pennsylvania common law; and

b.    Strict liability failure to warn, under Restatement (Second) of Torts § 402A, as adopted by Pennsylvania.

150.    These claims are grounded exclusively in duties Abbott independently owed under state law and are wholly consistent with, and parallel to, the requirements imposed by federal law. They do not seek to enforce the FDCA or rely on FDA discretion, and are therefore not impliedly preempted under *Buckman*.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Abbott Laboratories, Inc. for compensatory and punitive damages in an amount in excess of $75,000, together with interest, delay damages, costs of suit, and any other relief this Honorable Court deems just and proper.

<u>**COUNT V**</u>

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ABBOTT LABORATORIES, INC. AKA
ABBOTT LABORATORIES AKA
ST. JUDE MEDICAL, INC.

34

## SURVIVAL ACTION - STRICT PRODUCTS LIABILITY

151.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

152.    At all times relevant hereto, the Plaintiff was using the product in the manner for which it was intended.

153.    All the resultant losses, damages and injuries sustained by the Plaintiff resulted directly and proximately from the conduct of all Defendants subjecting them to strict liability and tort in the following particulars:

> a.   The product was manufactured, designed and placed in the stream of commerce in an unreasonably dangerous condition;
>
> b.   The unreasonably defective condition existed at the time the Defendant manufactured, fabricated and marketed the product;
>
> c.   The defective condition of the product proximately caused the fracture of the product and the injuries sustained by the Plaintiff thereby; and
>
> d.   The product malfunctioned.

## <u>COUNT VI</u>

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ABBOTT LABORATORIES, INC. AKA
ABBOTT LABORATORIES AKA
ST. JUDE MEDICAL, INC.
**SURVIVAL ACTION – NEGLIGENT MISREPRESENTATION**

154.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

155.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

156.    At all times relevant to this cause, and as detailed supra, the Defendant, Abbott, negligently provided plaintiff, the public at large, the medical community, and/or the FDA with false or incorrect information or omitted or failed to disclose material information concerning the Trifecta  and Trifecta GT valves, including but not limited to, misrepresentations relating to the following subject areas:

      a.    The safety of the G2™ Filter System;

      b.    The efficacy of the G2™ Filter Systems;

      c.    The rate of failure of the G2™ Filter System; and

      d.    The approved uses of the G2™ Filter System.

157.    Defendant Abbott intended that plaintiff, the public at large, the medical community, and/or the FDA rely on information they provided and defendants Abbott provided it for that purposes.

158.    Defendant Abbott failed to exercise reasonable care or competence in obtaining or communicating the information to plaintiffs, the public at large, the medical community, and/or the FDA.

159.    The plaintiff, the plaintiffs healthcare providers and medical community at large relied on the misrepresentation of the defendant, Abbott, in this regard, their reliance was justified, and as a direct and proximate result, the plaintiffs were damages as aforesaid.

160.    The plaintiff further alleges that the defendant, Abbott, acted in willful, wanton, gross and in total disregard for the health and safety of the user or consumer of its Trifecta and Trifecta GT valves, including plaintiff, acted to serve their own interests and having reason to know and consciously disregard the substantial risk that as a result of their negligent misrepresentations may result in their product killing or significantly injuring the rights of others,

consciously pursued a course of making misrepresentations knowing that such misrepresentations created a substantial risk of significant harm to other persons.

## COUNT VII

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ABBOTT LABORATORIES, INC. AKA
ABBOTT LABORATORIES AKA
ST. JUDE MEDICAL, INC.
**SURVIVAL ACTION – NEGLIGENCE**

161.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

162.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

163.    At all times relevant, Defendants Abbott Laboratories, Inc., and/or its predecessor St. Jude Medical, Inc. (collectively "Abbott"), were engaged in the business of designing, manufacturing, marketing, distributing, and selling medical devices, including the Trifecta GT Tissue Heart Valve (Model No. TFGT-21A), for use in surgical aortic valve replacement procedures.

164.    Abbott owed a duty to patients, including Regina Flood, to exercise reasonable care in the design, manufacture, labeling, testing, marketing, and post-sale surveillance of its medical devices, and to ensure that such products were reasonably safe for their intended use.

165.    Abbott further owed a duty to adequately warn physicians, hospitals, and patients of known or reasonably foreseeable risks associated with the use of its products.

166.    Abbott breached its duties of care by acting unreasonably, carelessly, and negligently in one or more of the following ways:

37

a.  Designing and placing into the stream of commerce a heart valve that was prone to premature structural deterioration, leaflet failure, or other mechanical defects;

b.  Failing to conduct appropriate durability testing or product evaluations prior to and after release of the Trifecta GT valve to ensure long-term safety;

c.  Failing to adequately monitor and investigate known patterns of early failure or adverse events associated with the Trifecta and Trifecta GT valves;

d.  Failing to timely notify physicians and patients, including Regina Flood and her treating medical team, of the risks of early structural valve deterioration;

e.  Failing to update product warnings, labeling, or instructions for use to reflect newly available information regarding premature failure rates;

f.  Continuing to promote and market the Trifecta GT valve as safe and durable despite accumulating evidence to the contrary;

g.  Failing to initiate a timely recall or withdrawal of the product once serious risks became apparent; and

h.  Failing to act as a reasonably prudent manufacturer would under the same or similar circumstances.

167.    As a direct and proximate result of Abbott's negligence, Plaintiff Regina Flood was implanted with the Trifecta GT valve in November 2019 and suffered progressive structural valve deterioration, resulting in severe aortic stenosis, repeated hospitalizations, and ultimately fatal cardiac decompensation on December 22, 2023.

168.    Ms. Flood's injuries and death were foreseeable consequences of Abbott's failure to design a safe device, failure to warn of known hazards, and failure to take reasonable post-sale action in response to adverse event information.

169.    As a direct and proximate result of Abbott's negligence, Plaintiff sustained the following damages:

      a.   Physical pain and suffering experienced by Ms. Flood prior to her death;

      b.   Loss of life and associated loss of enjoyment of life;

      c.   Emotional distress and mental anguish;

      d.   Medical expenses associated with treatment, hospitalization, and care;

      e.   Funeral and burial expenses;

      f.   Loss of support, services, guidance, and companionship suffered by Ms. Flood's surviving beneficiaries; and

      g.   All other losses and damages permitted by Pennsylvania law.

## COUNT VIII

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
JEFFERSON UNIVERSITY HOSPITALS, INC. d/b/a
JEFFERSON HEALTH
**SURVIVAL ACTION - NEGLIGENCE**

170.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

171.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

172.    Defendant Jefferson University Hospitals d/b/a Jefferson Health ("Jefferson Health") was under a duty to exercise care commensurate with the foreseeable risk of damage.

173.    Defendant Jefferson Health, by and through its employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, owed Plaintiff a duty to provide medical care and treatment in accordance with accepted medical standards applicable to healthcare facilities and medical professionals responsible for managing patients with aortic valve replacements.

174.    Defendant Jefferson Health, by and through its employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, had a duty to ensure that Plaintiff's medical treatment was managed with appropriate monitoring, supervision, and oversight.

175.    Defendant Jefferson Health, Defendant's employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD,  were charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

176.    Defendant Jefferson Health, Defendant's employees, agents, servants, contractors, and/or representatives failed to exercise care commensurate to the aforementioned risks and deviated from accepted medical standards.

177.    Defendant Jefferson Health was directly negligent in failing to establish, implement, and enforce adequate policies, procedures, and training to ensure that its physicians, including Daniel J. Makowski, DO and Alison L. Wand, MD, exercised appropriate care in managing the risks associated with aortic valve replacement.

178.    Plaintiff was a known high-risk patient with a documented history of recurrent hospitalizations for chest pain unrelieved by sublingual nitroglycerin and necessitating cardiac catheterization with stent placement.

179.    At no point did Defendant Jefferson Health implement or enforce a system to ensure that patients with aortic valve replacements experiencing recurrent episodes of chest pain and shortness of breath resulting in frequent hospitalizations undergo a coordinated review of the patient's overall cardiac function with frequent monitoring with regard to the valve replacement.

180.    Despite the implantation of the #21 St. Jude Trifecta prosthetic aortic valve replacement in February 2019 and its recall by Defendant Abbott February 2023, Defendant Jefferson Health failed to adopt or follow any standardized care pathways or alerts requiring enhanced monitoring of patients with the #21 St. Jude Trifecta prosthetic aortic valve replacement.

181.    On or about October 2, 2023, Mrs. Flood presented to the Emergency Department of Lehigh Valley Hospital – Cedar Crest with complaints of chest pain and diagnosed with a non-ST elevated myocardial infarction and admitted after a bedside echocardiogram showed a low left ventricular ejection fraction, a key measurement used to assess heart function.  She was discharged on October 5, 2023 and told to follow up with Daniel J. Maikowski, DO on October 23, 2023, a full 18 days later.  Defendant Jefferson Health failed to have in place any policy requiring timely follow-up for patients with aortic valve replacements and diminished heart function.

182.    The lack of timely follow up to Plaintiff's October 2, 2023 myocardial infarction and low left ventricular ejection fraction allowed Plaintiff's aortic valve replacement to further deteriorate leading to further hospitalizations and ultimately her death.

183.    Defendant Jefferson Health failed to have policies that required timely follow-up or alerting systems for patients with aortic valve replacements reporting chest pain and shortness

of breath. When Plaintiff was discharged from the hospital on October 5, 2023, there was no urgency displayed to provide timely medical follow-up with her treating providers.

184.    There was no corporate-level system in place to align treatment and test results across providers and institutions, resulting in dangerously fragmented care that failed to protect Plaintiff from the known risks the recalled Abbott #21 St. Jude Trifecta Prosthetic Aortic Valve Replacement.

185.    The failure to implement such systems, policies, and procedures was a substantial contributing factor in Plaintiff's catastrophic valve failure on December 21, 2023 and untimely death.

186.    The institutional failure to coordinate care, monitor for high-risk test results, enforce protocols regarding patients with aortic valve replacements, and respond to red-flag symptoms constitutes systemic corporate negligence.

187.    These failures reflect not isolated errors by individual providers, but a broader failure of the health care system, practice group, or entity to ensure continuity of care and patient safety for patients with aortic valve replacements under their collective supervision.

188.    As a direct and proximate result of the corporate negligence of Defendant Jefferson Health, Plaintiff suffered life-ending injuries, emotional and physical pain, and economic loss.

189.    Defendant Jefferson Health, by and through its employees, agents, servants, contractors, and/or representatives, deviated from the applicable standard of care by:

        a.    Failing to ensure that Plaintiff was monitored appropriately subsequent to suffering myocardial infarction and diminished heart function, despite the known risks of aortic valve failure;

b. Failing to provide adequate training and supervision to medical providers, including Daniel J. Makowski, DO and Alison L. Wand, MD regarding the risks of aortic valve failure in patients with the Abbott #21 St. Jude Trifecta Aortic Valve Replacement;

c. Failing to provide adequate training and supervision to medical providers, including Dr. Wand in recognizing the risks of discharging patients implanted with a recalled aortic valve who present with severe aortic stenosis post bioprosthetic aortic valve replacement.

d. Negligently allowing unsafe staff shortages to persist without adequate oversight or safeguards resulting in the rescheduling of critical procedures; and

e. Failing to intervene when Plaintiff exhibited warning signs of impending aortic valve failure including repeated episodes of chest pain, shortness of breath, hypertension, distress, and fatigue.

190. All acts, as alleged to have been done by employees, agents, servants, contractors, and/or representatives of Defendant Jefferson Health, were done within the scope of their duties or employment, contract, agency, or apparent agency.

191. Defendant Jefferson Health is further vicariously liable for the negligence of its employees, including Daniel J. Makowski, DO and Alison L. Wand, MD under the doctrine of respondent superior, as all actions and omissions alleged herein occurred within the course and scope of employment.

192.    As a direct and proximate result of Defendant Jefferson Health's negligence, deviation from the standard of care, and failure to establish appropriate policies and safeguards, Plaintiff suffered severe and permanent injuries, including but not limited to:

      a.  A catastrophic failure of the Abbott #21 St. Jude Trifecta Aortic Valve Replacement, resulting in multiple hospitalization, intensive care treatment and ultimately death;

      b.  Severe emotional distress, anxiety, and depression as a result of her injuries and loss of quality of life; and

      c.  Significant financial losses, including medical expenses, rehabilitation costs, lost wages, and future medical care needs.

193.    The claims alleged against Defendant Jefferson Health are in the form of professional negligence itself and/or acting by and through its employees, agents, servants, contractors, and/or representatives.

194.    The conduct of Defendant Jefferson Health, by and through its senior administrative and clinical leadership, exhibited reckless indifference to the rights and safety of patients, including Plaintiff, by failing to implement, enforce, or supervise essential policies and protocols necessary to safeguard patients with aortic valve replacements.

195.    Defendant Jefferson Health knew, and was repeatedly made aware, through clinical documentation and Abbott Laboratories, that Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement had been recalled and was known to exhibit early structural valve deterioration, yet consciously failed to intervene or direct corrective action, reflecting a knowing disregard for patient safety.

44

196.    The failures by Defendant Jefferson Health were not isolated oversights but demonstrated systemic, enterprise-level indifference to obvious, documented medical dangers that posed a high risk of death or catastrophic injury.

197.    Defendant Jefferson Health failed to implement policies, procedures and training to avoid the injury caused to the Plaintiff despite knowledge of the Plaintiff's condition.

198.    Accordingly, Defendant Jefferson Health acted with reckless disregard for the health and safety of Plaintiff, justifying the imposition of punitive damages under Pennsylvania law and the MCARE Act, 40 P.S. § 1303.505.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Jefferson Health for an amount in excess of SEVENTY-FIVE  THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages.  Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

## COUNT IX

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
LEHIGH VALLEY HEALTH NETWORK
**SURVIVAL ACTION - NEGLIGENCE**

199.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

200.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

201.    Defendant Lehigh Valley Health Network (hereinafter "LVHN") was under a duty to exercise care commensurate with the foreseeable risk of damage.

202.    Defendant LVHN, by and through its employees, agents, servants, contractors, and/or representatives, Daniel J. Makowski, DO and Alison L. Wand, MD, owed Plaintiff a duty to provide medical care and treatment in accordance with accepted medical standards applicable to healthcare facilities and medical professionals responsible for managing anticoagulated patients with aortic valve replacements.

203.    Defendant LVHN, by and through its employees, agents, servants, contractors, and/or representatives, Daniel J. Makowski, DO and Alison L. Wand, MD, had a duty to ensure that Plaintiff's medical treatment was managed with appropriate monitoring, supervision, and oversight.

204.    Defendant LVHN, Defendant's employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD were charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

205.    Defendant LVHN, Defendant's employees, agents, servants, contractors, and/or representatives failed to exercise care commensurate to the aforementioned risks and deviated from accepted medical standards.

206.    Defendant LVHN was directly negligent in failing to establish, implement, and enforce adequate policies, procedures, and training to ensure that its physicians, including Daniel J. Makowski, DO and Alison L. Wand, MD, exercised appropriate care in managing the risks associated with aortic valve replacement.

207.    Plaintiff was a known high-risk patient with a documented history of recurrent hospitalizations for chest pain unrelieved by sublingual nitroglycerin and necessitating cardiac catheterization with stent placement.

208.   At no point did Defendant LVHN implement or enforce a system to ensure that patients with aortic valve replacements experiencing recurrent episodes of chest pain and shortness of breath resulting in frequent hospitalizations undergo a coordinated review of the patient's overall cardiac function with frequent monitoring with regard to the valve replacement.

209.   Despite the implantation of the #21 St. Jude Trifecta prosthetic aortic valve replacement in February 2019 and its recall by Defendant Abbott in February 2023, Defendant LVHN failed to adopt or follow any standardized care pathways or alerts requiring enhanced monitoring of patients with the #21 St. Jude Trifecta prosthetic aortic valve replacement.

210.   On or about October 2, 2023, Mrs. Flood presented to the Emergency Department of Lehigh Valley Hospital – Cedar Crest with complaints of chest pain and was diagnosed with a non-ST elevated myocardial infarction and admitted after a bedside echocardiogram showed a low left ventricular ejection fraction, a key measurement used to assess heart function.  She was discharged on October 5, 2023 and told to follow up with Daniel J. Makowski, DO on October 23, 2023, a full 18 days later.  Defendant LVHN failed to have in place any policy requiring timely follow up for patients with aortic valve replacement sand diminished heart function.

211.   The lack of timely follow up to Plaintiff's October 2, 2023 myocardial infarction and low left ventricular ejection fraction allowed Plaintiff's aortic valve replacement to further deteriorate leading to further hospitalizations and ultimately her death.

212.   Defendant LVHN failed to have policies and procedures that required timely follow up or alerting systems for patients with aortic valve replacements reporting chest pain and shortness of breath.  When Plaintiff was discharged from the hospital on October 5, 2023, there was no urgency displayed to provide timely medical follow up with her treating providers.

213.    There was no corporate-level system in place to align treatment and test results across providers and institutions, resulting in dangerously fragmented care that failed to protect Plaintiff from the known risks of the recalled Abbott #21 St. Jude Trifecta Prosthetic Aortic Valve Replacement.

214.    The failure to implement such systems, policies and procedures was a substantial contributing factor in Plaintiff's catastrophic valve failure on December 21, 2023 and untimely death.

215.    The institutional failure to coordinate care, monitor for high-risk test results, enforce surgical protocols regarding patients with aortic valve replacements, and respond to red-flag symptoms constitutes systemic corporate negligence.

216.    These failures reflect not isolated errors by individual providers, but a broader failure of the health care system, practice group, or entity to ensure continuity of care and patient safety for patients with aortic valve replacements under their collective supervision.

217.    As a direct and proximate result of the corporate negligence of Defendant LVHN, Plaintiff suffered life-ending injuries, emotional and physical pain and economic loss.

218.    Defendant LVHN, by and through its employees, agents, servants, contractors, and/or representatives, deviated from the applicable standard of care by:

      a.  Failing to ensure that Plaintiff was monitored appropriately subsequent to suffering myocardial infarction and diminished heart function, despite the known risks of aortic valve failure;

      b.  Failing to provide adequate training and supervision to medical providers, including Daniel J. Makowski, DO and Alison L. Wand, MD regarding the

risks of aortic valve failure in patients with the Abbott #21 St. Jude Trifecta Aortic Valve Replacement;

c.  Filing to provide adequate training and supervision to medical providers, including Dr. Wand in recognizing the risks of discharging patients implanted with a recalled aortic valve who present with severe aortic stenosis post bioprosthetic aortic valve replacement;

d.  Failing to ensure adequate staffing within departments to avoid the necessity of rescheduling critical procedures;

e.  Negligently allowing unsafe staff shortages to persist without adequate oversight or safeguards resulting in the rescheduling of critical procedures; and

f.  Failing to intervene when Plaintiff exhibited warning signs of impending aortic valve failure including repeated episodes of chest pain, shortness of breath, hypertension, distress and fatigue.

219.    All acts, as alleged to have been done by employees, agents, servants, contractors, and/or representatives of Defendant LVHN, were done within the scope of their duties or employment, contract, agency, or apparent agency.

220.    Defendant LVHN is further vicariously liable for the negligence of its employees, including Daniel J. Makowski, DO and Alison L. Wand, MD under the doctrine of respondent superior, as all actions and omissions alleged herein occurred within the course and scope of employment.

221.    As a direct and proximate result of Defendant LVHN's negligence, deviation from the standard of care, and failure to establish appropriate policies and safeguards, Plaintiff suffered severe and permanent injuries, including but not limited to:

a.  A catastrophic failure of the Abbott #21 St. Jude Trifecta Aortic Valve Replacement, resulting in multiple hospitalizations, intensive care treatments and ultimately death;

b.  Severe emotional distress, anxiety, and depression as a result of her injuries and loss of quality of life; and

c.  Significant financial losses, including medical expenses, rehabilitation costs, lost wages, and future medical care needs.

222.    The claims alleged against Defendant LVHN are in the form of professional negligence itself and/or acting by and through its employees, agents, servants, contractors, and/or representatives.

223.    The conduct of Defendant LVHN, by and through its senior administrative and clinical leadership, exhibited reckless indifference to the rights and safety of patients, including Plaintiff, by failing to implement, enforce, or supervise essential policies and protocols necessary to safeguard patients with aortic valve replacements.

224.    Defendant LVHN knew, and was repeatedly made aware, through clinical documentation and Abbott Laboratories, that Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement had been recalled and was known to exhibit early structural valve deterioration, yet consciously failed to intervene or direct corrective action, reflecting a knowing disregard for patient safety.

225.    The failures by Defendant LVHN were not isolated oversights but demonstrated systemic, enterprise-level indifference to obvious, documented medical dangers that posed a high risk of death or catastrophic injury.

226.    Defendant LVHN failed to implement policies, procedures and training to avoid the injury caused to the Plaintiff despite knowledge of the Plaintiff's condition.

227.    Accordingly, Defendant LVHN acted with reckless disregard for the health and safety of Plaintiff, justifying the imposition of punitive damages under Pennsylvania law and the MCARE Act, 40 P.S. § 1303.505.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant LVHN for an amount in excess of SEVENTY-FIVE  THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages.  Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

## COUNT X

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
LEHIGH VALLEY HEALTH NETWORK
**SURVIVAL ACTION - BREACH OF EXPRESS WARRANTY AND IMPLIED WARRANTY OF MERCHANTABILITY**

228.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

229.    Decedent, Regina Flood, through her treating physicians and implanting hospital, was provided with the Trifecta Valve with Glide Technology ("Trifecta GT") manufactured, marketed, and sold by Defendant Abbott Laboratories. The Trifecta GT was selected and

51

implanted based on the representations made by Abbott and the information available to the treating medical providers at the time.

230.    At all times relevant to this cause of action, Defendant Abbott Laboratories was a merchant of medical devices, including Class III cardiovascular implants such as the Trifecta GT aortic valve, and held itself out as an expert in the design, manufacture, testing, and marketing of such devices.

231.    At the time and place of sale, distribution, and supply of the Trifecta GT to Plaintiff's providers, Abbott expressly warranted that the valve was safe, durable, and effective for its intended purpose of aortic valve replacement. Abbott further impliedly warranted that the Trifecta GT was merchantable, fit for ordinary use, and would function reliably for its expected duration in a patient population like Plaintiff's.

232.    In truth, the Trifecta GT valve implanted in Plaintiff was not merchantable and not fit for its ordinary or intended purpose, because:

    a.    It was designed in such a way as to be prone to early structural valve deterioration, including leaflet tear, calcification, and stenosis, within 2 to 3 years post-implantation;

    b.    It was materially the same in structure and tissue composition as its predecessor valve, which had already exhibited a pattern of early failure;

    c.    Abbott failed to disclose known post-market durability issues, which significantly impaired the reliability and safety of the valve.

233.    In addition, Abbott breached its implied warranties in that:

a. It failed to provide adequate warnings or instructions regarding the risks of early structural valve deterioration (SVD), despite being aware of these risks prior to and during the time Plaintiff's device was in use;

b. The Trifecta GT valve did not conform to Abbott's own representations of long-term durability and safety;

c. The product was more dangerous than an ordinary patient or physician would expect, especially in light of the FDA-approved indications and labeling;

d. The Trifecta GT deviated materially from durability expectations established by comparable bioprosthetic valves on the market, and the defects in the device existed at the time it left Abbott's control.

234.    Plaintiff's treating physicians and the implanting hospital reasonably relied on Abbott's express and implied warranties when selecting the Trifecta GT valve for surgical implantation, unaware that the device was already associated with premature failures in the post-market setting.

235.    Despite early signs of valve stenosis and performance deterioration, the hospital defendants failed to recognize or act upon the device's failure, delaying diagnosis and necessary reintervention. This breach of medical duty compounded the harms caused by Abbott's defective product.

236.    The valve was unfit and unsafe for long-term use, and failed well before the expected 10–15-year lifespan for the surgical bioprostheses, directly contradicting Abbott's warranties and representations.

237.    As a direct and proximate result of the breaches of express and implied warranties by Abbott and the corresponding negligence by the hospital defendants, the Decedent, Regina Flood, sustained permanent and continuing injuries, including valve dysfunction, impaired cardiac function, physical pain, emotional suffering, and loss of quality of life which ultimately resulted in the Decedent's death.

238.    Furthermore, Abbott acted with willful, wanton, and reckless disregard for the safety of patients, including Plaintiff, by continuing to market and distribute the Trifecta GT despite post-market evidence of early failure and by failing to proactively warn the medical community or the FDA until compelled by regulatory pressure. This conduct was driven by profit motives and undertaken with full knowledge of the substantial risks posed to patients like Plaintiff.

239.    As a result, punitive and exemplary damages are appropriate for Abbott's deliberate and reckless conduct and to deter similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Cedar Crest for an amount in excess of SEVENTY-FIVE THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages. Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

## <u>COUNT XI</u>

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
LEHIGH VALLEY HOSPITAL – CEDAR CREST
**SURVIVAL ACTION - NEGLIGENCE**

240.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

241.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

242.    Defendant Lehigh Valley Hospital – Cedar Crest (hereinafter "Cedar Crest") was under a duty to exercise care commensurate with the foreseeable risk of damage.

243.    Defendant Cedar Crest, by and through its employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, owed Plaintiff a duty to provide medical care and treatment in accordance with accepted medical standards applicable to healthcare facilities and medical professionals responsible for managing patients with aortic valve replacements.

244.    Defendant Cedar Crest, by and through its employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, had a duty to ensure that Plaintiff's medical treatment was managed with appropriate monitoring, supervision, and oversight.

245.    Defendant Cedar Crest, Defendant's employees, agents, servants, contractors, and/or representatives, including but not limited to Daniel J. Makowski, DO and Alison L. Wand, MD, were charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

246.    Defendant Cedar Crest, Defendant's employees, agents, servants, contractors, and/or representatives failed to exercise care commensurate to the aforementioned risks and deviated from accepted medical standards.

247.    Defendant Cedar Crest was directly negligent in failing to establish, implement, and enforce adequate policies, procedures, and training to ensure that its physicians, including

Daniel J. Makowski, DO and Alison L. Wand, MD, exercised appropriate care in managing the risks associated with aortic valve replacement.

248.    Plaintiff was a known high-risk patient with a documented history of recurrent hospitalizations for chest pain unrelieved by sublingual nitroglycerin and necessitating cardiac catheterization with stent placement.

249.    At no point did Defendant Cedar Crest implement or enforce a system to ensure that patients with aortic valve replacement experiencing recurrent episodes of chest pain and shortness of breath resulting in frequent hospitalizations undergo a coordinated review of the patient's overall cardiac function with frequent monitoring with regard to the valve replacement.

250.    Despite the implantation of the #221 St. Jude Trifecta prosthetic aortic valve replacement in February 2019 and its recall by Defendant Abbott in February 2023, Defendant Cedar Crest failed to adopt or follow any standardized care pathways or alerts requiring enhanced monitoring of patients with the #21 St. Jude Trifecta prosthetic aortic valve replacement.

251.    On or about October 2, 2023, Mrs. Flood presented to the Emergency Department of Lehigh Valley Hospital – Cedar Crest with complaints of chest pain and was diagnosed with a non-ST elevated myocardial infraction and admitted after a bedside echocardiogram showed a low left ventricular ejection fraction, a key measurement used to assess heart function.  She was discharged on October 5, 2023 and told to follow up with Daniel J. Makowski, DO on October 23, 2023, a full 18 days later.  Defendant Cedar Crest failed to have in place any policy requiring timely follow up for patients with aortic valve replacement and diminished heart function.

252.    The lack of timely follow up to Plaintiff's October 2, 2023 myocardial infarction and low left ventricular ejection fraction allowed Plaintiff's aortic valve replacement to further deteriorate leading to  further hospitalizations and ultimately her death.

253.    Defendant Cedar Crest failed to have policies that required timely follow-up or alerting systems for patients with aortic valve replacement reporting chest pain and shortness of breath. When Plaintiff was discharged from the hospital on October 5, 2023, there was no urgency displayed to provide timely medical follow up with he4r treating providers.

254.    There was no corporate-level system in place to align treatment and test results across providers and institutions, resulting in dangerously fragmented care that failed to protect Plaintiff from the known risks of the recalled Abbott #21 St. Jude Trifecta Prosthetic Aortic Valve Replacement.

255.    The failure to implement such systems, policies, and procedures was a substantial contributing factor in Plaintiff's catastrophic valve failure on December 21, 2023 and untimely death.

256.    The institutional failure to coordinate care, monitor for high-risk test results, enforce protocols regarding patients with aortic valve replacement and respond to red-flag symptoms constitutes systemic corporate negligence.

257.    These failures reflect not isolated errors by individual providers, but a broader failure of the health care system, practice group, or entity to ensure continuity of care and patient safety for patients with aortic valve replacement under their collective supervision.

258.    As a direct and proximate result of the corporate negligence of Defendant Cedar Crest, Plaintiff suffered life-ending injuries, emotional and physical pain, and economic loss.

259.    Defendant Cedar Crest, by and through its employees, agents, servants, contractors, and/or representatives, deviated from the applicable standard of care by:

a.  Failing to ensure that Plaintiff was monitored appropriately subsequent to suffering myocardial infarction and diminished heart function, despite the known risks of aortic valve failure;

b.  Failing to provide adequate training and supervision to medical providers, including Daniel J. Makowski, DO and Alison L. Wand, MD regarding the risks of aortic valve failure in patients with the Abbott #21 St. Jude Trifecta Aortic Valve Replacement;

c.  Failing to provide adequate training and supervision to medical providers, including Alison L. Wand, MD in recognizing the risks of discharging patients implanted with a recalled aortic valve who present with severe aortic stenosis post bioprosthetic aortic valve replacement;

d.  Negligently allowing unsafe staff shortages to persist without adequate oversight or safeguards resulting in the rescheduling of critical procedures; and

e.  Failing to intervene when Plaintiff exhibited warning signs of impending aortic valve failure including repeated episodes of chest pain, shortness of breath, hypertension, distress, and fatigue.

260.    All acts, as alleged to have been done by employees, agents, servants, contractors, and/or representatives of Defendant Cedar Crest, were done within the scope of their duties or employment, contract, agency, or apparent agency.

261.    Defendant Cedar Crest is further vicariously liable for the negligence of its employees, including Danield J. Makowski, DO and Alison L. Wand, MD under the doctrine of

respondent superior, as all actions and omissions alleged herein occurred within the course and scope of employment.

262.    As a direct and proximate result of Defendant Cedar Crest's negligence, deviation from the standard of care, and failure to establish appropriate policies and safeguards, Plaintiff suffered severe and permanent injuries, including but not limited to:

      a.  A catastrophic failure of the Abbott #21 St. Jude Trifecta Aortic Valve Replacement, resulting in multiple hospitalizations, intensive care treatment and ultimately death;

      b.  Severe emotional distress, anxiety, and depression as a result of her injuries and loss of quality of life; and

      c.  Significant financial losses, including medical expenses, rehabilitation costs, lost wages, and future medical care needs.

263.    The claims alleged against Defendant Cedar Crest are in the form of professional negligence itself and/or acting by and through its employees, agents, servants, contractors, and/or representatives.

264.    The conduct of Defendant Cedar Crest, by and through its senior administrative and clinical leadership, exhibited reckless indifference to the rights and safety of patients, including Plaintiff, by failing to implement, enforce, or supervise essential policies and protocols necessary to safeguard anticoagulated patients with aortic valve replacement.

265.    Defendant Cedar Crest knew, and was repeatedly made aware, through clinical documentation and Abbott Laboratories, that Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement had been recalled and was known to exhibit early structural valve deterioration, yet

consciously failed to intervene or direct correct action, reflecting a knowing disregard for patient safety.

266.    The failures by Defendant Cedar Crest were not isolated oversights but demonstrated systemic, enterprise-level indifference to obvious, documented medical dangers that posed a high risk of death or catastrophic injury.

267.    Accordingly, Defendant Cedar Crest acted with reckless disregard for the health and safety of Plaintiff, justifying the imposition of punitive damages under Pennsylvania law and the MCARE Act, 40 P.S. § 1303.505.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Cedar Crest for an amount in excess of SEVENTY-FIVE THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages. Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

## COUNT XII

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
LEHIGH VALLEY CARDIOLOGY
**SURVIVAL ACTION - NEGLIGENCE**

268.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

269.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

270.    Defendant Lehigh Valley Cardiology was under a duty to exercise care commensurate with the foreseeable risk of damage.

271.    Defendant Lehigh Valley Cardiology, by and through its employees, agents, servants, contractors, and/or representatives, Daniel J. Makowski, DO and Alison L. Wand, MD, owed Plaintiff a duty to provide medical care and treatment in accordance with accepted medical standards applicable to healthcare facilities and medical professionals responsible for managing patients with aortic valve replacements.

272.    Defendant Lehigh Valley Cardiology, by and through its employees, agents, servants, contractors, and/or representatives, including Daniel J. Makowski, DO and Alison L. Wand, MD, had a duty to ensure that Plaintiff's medical treatment was managed with appropriate monitoring, supervision, and oversight.

273.    Defendant Lehigh Valley Cardiology, Defendant's employees, agents, servants, contractors, and/or representatives were charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

274.    Defendant Lehigh Valley Cardiology, Defendant's employees, agents, servants, contractors, and/or representatives failed to exercise care commensurate to the aforementioned risks and deviated from accepted medical standards.

275.    Defendant Lehigh Valley Cardiology was directly negligent in failing to establish, implement, and enforce adequate policies, procedures, and training to ensure that its physicians, including Daniel J. Makowski, DO and Alison L. Wand, MD, exercised appropriate care in managing the risks associated with aortic valve replacements.

276.    Defendant Lehigh Valley Cardiology, by and through its employees, agents, servants, contractors, and/or representatives, deviated from the applicable standard of care by:

a.  Failing to ensure that Plaintiff was monitored appropriately subsequent to suffering myocardial infarction and diminished heart function, despite the known risks of aortic valve failure;

b.  Failing to provide adequate training and supervision to medical providers, including Daniel J. Makowski, DO and Alison L. Wand, MD regarding the risks of aortic valve failure in patients with the Abbott #21 St. Jude Trifecta Aortic Valve Replacement;

c.  Failing to provide adequate training and supervision to medical providers, including Alison L. Wand, MD in recognizing the risks of discharging patients implanted with a recalled aortic valve who present with severe aortic stenosis post bioprosthetic aortic valve replacement;

d.  Negligently allowing unsafe staff shortages to persist without adequate oversight or safeguards resulting in the rescheduling of critical procedures; and

e.  Failing to intervene when Plaintiff exhibited warning signs of impending aortic valve failure including repeated episodes of chest pain, shortness of breath, hypertension, distress, and fatigue.

277.    All acts, as alleged to have been done by employees, agents, servants, contractors, and/or representatives of Defendant Lehigh Valley Cardiology, were done within the scope of their duties or employment, contract, agency, or apparent agency.

278.    Defendant Lehigh Valley Cardiology is further vicariously liable for the negligence of its employees, including Daniel J. Makowski, DO and Alison L. Wand, MD under the doctrine

of respondent superior, as all actions and omissions alleged herein occurred within the course and scope of employment.

279.    As a direct and proximate result of Defendant Lehigh Valley Cardiology's negligence, deviation from the standard of care, and failure to establish appropriate policies and safeguards, Plaintiff suffered severe and permanent injuries, including but not limited to:

      a.    A catastrophic failure of the Abbott #21 St. Jude Trifecta Aortic Valve Replacement, resulting in multiple hospitalizations, intensive care treatment and ultimately death;

      b.    Severe emotional distress, anxiety, and depression as a result of her injuries and loss of quality of life; and

      c.    Significant financial losses, including medical expenses, rehabilitation costs, lost wages, and future medical care needs.

280.    The claims alleged against Defendant Lehigh Valley Cardiology are in the form of professional negligence itself and/or acting by and through its employees, agents, servants, contractors, and/or representatives.

281.    Defendant Lehigh Valley Cardiology, through its supervisory agents and quality management personnel, had actual knowledge of the risks associated the #21 St. Jude Trifecta Aortic Valve Replacement but chose to proceed with conservative treatment and forgo timely valve replacement surgery in conscious disregard of these dangers.

282.    Defendant Lehigh Valley Cardiology failed to establish interdepartmental communication systems, protocols, or flags to alert providers to aortic valve replacement risks and failed to require timely follow up after hospitalizations reflecting a systemic, deliberate indifference to high-risk patient outcomes.

283.    These omissions occurred in the face of well-established medical guidelines and constitute more than mere negligence—they show a reckless and willful disregard for known safety protocols, justifying punitive damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Lehigh Valley Cardiology for an amount in excess of SEVENTY-FIVE  THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages.  Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

### COUNT XIII

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
CARDIAC DIAGNOSTIC CENTER at LEHIGH
VALLEY HOSPITAL - MUHLENBERG
**SURVIVAL ACTION - NEGLIGENCE**

284.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

285.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

286.    Defendant Cardiac Diagnostic Center at Lehigh Valley Hospital – Muhlenberg (hereinafter LVHN Cardiac Diagnostic Center) was  under a duty to exercise care commensurate with the foreseeable risk of damage.

287.    Defendant LVHN Cardiac Diagnostic Center, by and through its employees, agents, servants, contractors, and/or representatives, owed Plaintiff a duty to provide medical care and treatment in accordance with accepted medical standards applicable to healthcare facilities and medical professionals responsible for managing patients with aortic valve replacements.

64

288.    Defendant LVHN Cardiac Diagnostic Center, by and through its employees, agents, servants, contractors, and/or representatives, had a duty to ensure that Plaintiff's medical treatment, including aortic valve replacement surgery was managed with appropriate monitoring, supervision, and oversight.

289.    Defendant LVHN Cardiac Diagnostic Center, Defendant's employees, agents, servants, contractors, and/or representatives were charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

290.    Defendant LVHN Cardiac Diagnostic Center, Defendant's employees, agents, servants, contractors, and/or representatives failed to exercise care commensurate to the aforementioned risks and deviated from accepted medical standards.

291.    Defendant LVHN Cardiac Diagnostic Center was directly negligent in failing to establish, implement, and enforce adequate policies, procedures, and training to ensure that its physicians exercised appropriate care in managing the risks associated with patients requiring aortic valve replacement surgery.

292.    Defendant LVHN Cardiac Diagnostic Center was directly negligent in failing to establish, implement and enforce policies and procedures to ensure adequate anesthesiology staffing to safeguard against the need to reschedule critical surgeries.

293.    Defendant LVHN Cardiac Diagnostic Center, by and through its employees, agents, servants, contractors, and/or representatives, deviated from the applicable standard of care by:

   a.    Failing to ensure that Plaintiff was monitored appropriately subsequent to suffering myocardial infarction and diminished heart function, despite the known risks of aortic valve failure;

b. Failing to provide adequate training and supervision to employees, agents, servants, contractors, and/or representatives in recognizing the risks of delaying valve replacement surgery in patients implanted with a recalled aortic valve who present with severe aortic stenosis post bioprosthetic aortic valve replacement;

c. Negligently allowing unsafe staffing shortages to persist without adequate oversight or safeguards resulting in the rescheduling of critical procedures; and

d. Failing to intervene and delay surgery when Plaintiff exhibited warning signs of impending aortic valve failure including repeated episodes of chest pain, shortness of breath, hypertension, distress, and fatigue.

294.    All acts, as alleged to have been done by employees, agents, servants, contractors, and/or representatives of Defendant LVHN Cardiac Diagnostic Center, were done within the scope of their duties or employment, contract, agency, or apparent agency.

295.    Defendant LVHN Cardiac Diagnostic Center is further vicariously liable for the negligence of its employees under the doctrine of respondent superior, as all actions and omissions alleged herein occurred within the course and scope of employment.

296.    As a direct and proximate result of Defendant LVHN Cardiac Diagnostic Center's negligence, deviation from the standard of care, and failure to establish appropriate policies and safeguards, Plaintiff suffered severe and permanent injuries, including but not limited to:

a. A catastrophic failure of the Abbott #21 St. Jude Trifecta Aortic Valve Replacement, resulting in multiple hospitalizations, intensive care treatment and ultimately death;

    b.   Severe emotional distress, anxiety, and depression as a result of her injuries and loss of quality of life; and

    c.   Significant financial losses, including medical expenses, rehabilitation costs, lost wages, and future medical care needs.

297.   The claims alleged against Defendant LVHN Cardiac Diagnostic Center are in the form of professional negligence itself and/or acting by and through its employees, agents, servants, contractors, and/or representatives.

298.   Defendant LVHN Cardiac Diagnostic Center, through its supervisory agents and quality management personnel, had actual knowledge of the risks associated the #21 St. Jude Trifecta Aortic Valve Replacement but chose to reschedule a critical valve replacement surgery in conscious disregard of these dangers.

299.   Defendant LVHN Cardiac Diagnostic Center failed to establish interdepartmental communication systems, protocols, or flags to alert departments of staffing requirements and ensure adequate staffing for all procedures reflecting a systemic, deliberate indifference to high-risk patient outcomes.

300.   These omissions occurred in the face of well-established medical guidelines and constitute more than mere negligence—they show a reckless and willful disregard for known safety protocols, justifying punitive damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant LVHN Cardiac Diagnostic Center for an amount in excess of SEVENTY-FIVE  THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages.  Plaintiff

further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

## COUNT XIV

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
DANIEL J. MAKOWSKI, DO
**SURVIVAL ACTION - NEGLIGENCE**

301.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

302.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

303.    The claims alleged against Defendant Daniel J. Makowski, DO are in the form of professional negligence for:

> e.  Failure to identify a medical condition that a competent practitioner would have diagnosed, thereby causing Plaintiff harm;
>
> f.  Allowing a medical condition to go undiagnosed for a prolonged period of time resulting in worsened health outcomes for Plaintiff;
>
> g.  Providing inappropriate treatment and/or medications and/or testing for Plaintiff's condition leading to complications and permanent harm;
>
> h.  Failing to adequately inform and/or warn Plaintiff about the risks of her medical condition;
>
> i.  Failing to properly monitor Plaintiff's medical condition which lead to complications and a deterioration of Plaintiff's health and well-being;
>
> j.  Failing to refer Plaintiff to a specialist when her condition worsened; and
>
> k.  Failing to provide proper follow-up care and/or instructions, leading to complications and a deterioration of Plaintiff's health and well-being.

304.    Defendant Daniel J. Makowski, DO was under a duty to exercise care commensurate with the foreseeable risk of damage.

305.    Defendant Daniel J. Makowski, DO owed Plaintiff a duty of care consistent with the accepted standards of medical practice for physicians treating patients with aortic valve replacements.

306.    Defendant Daniel J. Makowski, DO had a duty to properly assess, diagnose, monitor, and treat Plaintiff's medical condition, including recognizing potential catastrophic aortic valve failure.

307.    Defendant Daniel J. Makowski, DO was charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

308.    Defendant Daniel J. Makowski's actions fell below the applicable standard of medical care, constituting gross deviation from accepted medical practice, which a reasonably prudent physician would not have committed under similar circumstances.

309.    Defendant Daniel J. Makowski's negligence was a direct and proximate cause of Plaintiff's catastrophic injuries, which include but are not limited to:

l.  Catastrophic failure of Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement, resulting in prolonged hospitalization, intensive care treatment, and ultimately death;

m.  Permanent physical disabilities, affecting mobility and the ability to perform daily activities;

n.  Chronic pain, extreme fatigue, and ongoing medical complications requiring continuous medical care and rehabilitation until her untimely death;

o.  Severe emotional distress, anxiety, and depression due to the loss of Plaintiff's previous quality of life until her untimely death; and

p.  Significant financial losses, including medical expenses.

310.    Defendant Daniel J. Makowski, DO breached his duty to Plaintiff and failed to exercise care commensurate with the reasonably foreseeable risks and was negligent.

311.    As a direct and proximate result of the negligent acts as set forth above, Plaintiff suffered permanent injury and damages in the form of death.

312.    Defendant Daniel J. Makowski, DO had actual knowledge that Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement had been recalled and was known to exhibit early structural valve deterioration, yet consciously failed to intervene or direct corrective action, reflecting a knowing disregard for patient safety.

313.    Defendant Daniel J. Makowski, DO failure to increase monitoring frequency, ignore red flag symptoms, and continued conservative treatment constitute acts that constitute a gross deviation from the standard of care and demonstrate a reckless indifference to Plaintiff's safety.

314.    Defendant Daniel J. Makowski's failure to act in light of clear clinical indicators of imminent catastrophic aortic valve failure supports an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Daniel J. Makowski, DO for an amount in excess of SEVENTY-FIVE THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages. Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

## COUNT XV

ESTATE OF REGINA FLOOD
By and through its Executor, Laurie Flood
v.
ALISON L. WAND, MD
**SURVIVAL ACTION – NEGLIGENCE**

70

315.    Plaintiff incorporates by reference all previous paragraphs as fully as though set forth herein at length.

316.    This Count is brought pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, by the Estate of Regina Flood, through her duly appointed Executor, Laurie Flood.

317.    The claims alleged against Defendant Alison L. Wand, MD are in the form of professional negligence for:

        q.  Failure to identify a medical condition that a competent practitioner would have diagnosed, thereby causing Plaintiff harm;

        r.  Allowing a medical condition to go undiagnosed for a prolonged period of time resulting in worsened health outcomes for Plaintiff;

        s.  Providing inappropriate treatment and/or medications and/or testing for Plaintiff's condition leading to complications and permanent harm;

        t.  Failing to adequately inform and/or warn Plaintiff about the risks of her medical condition;

        u.  Failing to properly monitor Plaintiff's medical condition which lead to complications and a deterioration of Plaintiff's health and well-being;

        v.  Failing to properly assess Plaintiff's overall medical condition prior to discharge;

        w.  Failing to refer Plaintiff to a specialist when her condition worsened; and

        x.  Failing to provide proper follow-up care and/or instructions, leading to complications and a deterioration of Plaintiff's health and well-being.

318.    Defendant Alison L. Wand, MD, was under a duty to exercise care commensurate with the foreseeable risk of damage.

319.    Defendant Alison L. Wand, MD owed Plaintiff a duty of care consistent with the accepted standards of medical practice for physicians treating patients with aortic valve replacement.

320.    Defendant Alison L. Wand, MD, had a duty to properly assess, diagnose, monitor, and treat Plaintiff's medical condition, including recognizing potential for catastrophic aortic valve failure and the need for timely follow up.

321.    Defendant Alison L. Wand, MD, was charged with the duty to exercise care commensurate with the reasonably foreseeable risk of damages and/or injury to Plaintiff.

322.    Defendant Dr. Wand's actions fell below the applicable standard of medical care, constituting gross deviation from accepted medical practice, which a reasonably prudent physician would not have committed under similar circumstances.

323.    Defendant Dr. Wand's negligence was a direct and proximate cause of Plaintiff's catastrophic injuries, which include but are not limited to:

      a.   Catastrophic failure of Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement, resulting in prolonged hospitalization, intensive care treatment, and ultimately death;

      b.   Permanent physical disabilities, affecting mobility and the ability to perform daily activities;

      c.   Chronic pain, extreme fatigue, and ongoing medical complications requiring continuous medical care and rehabilitation until her untimely death;

      d.   Severe emotional distress, anxiety, and depression due to the loss of Plaintiff's previous quality of life until her untimely death; and

      e.   Significant financial losses, including medical expenses.

324.    Defendant Alison L. Wand, MD, breached her duty to Plaintiff and failed to exercise care commensurate with the reasonably foreseeable risks and was negligent.

325.    As a direct and proximate result of the negligent acts as set forth above, Plaintiff suffered permanent injury and damages.

326.    Defendant Alison L. Wand, MD had actual knowledge that Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement had been recalled and was known to exhibit early structural valve deterioration yet chose to discharge Plaintiff on December 1, 2023, following a diagnosis of UASTEMI (unstable angina non-ST elevated myocardial infarction) and diminished heart function, directing Plaintiff to follow up with Daniel J. Makowski, DO on December 23, 2023 reflecting a knowing disregard for patient safety.

327.    The egregious nature of Dr. Wand's decision to discharge Plaintiff under these conditions, combined with the direction not to follow up with Dr. Makowski until December 23, 2023 contributed to the catastrophic failure of Plaintiff's #21 St. Jude Trifecta Aortic Valve Replacement and resulting death of Plaintiff on December 22, 2023, justifies the imposition of punitive damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant Alison L. Wand, MD for an amount in excess of SEVENTY-FIVE  THOUSAND AND 00/100 UNITED STATES DOLLARS ($75,000.00), together with interest, costs and such other relief as may be awarded by the Court, together with costs of suit and delay damages.  Plaintiff further demands judgment against Defendant for punitive damages for its willful disregard for Plaintiff.

### IV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Patricia Smith demands judgment against Defendants and requests the following relief:

328.    At all times relevant hereto, Defendants engaged in willful, wanton, reckless, and outrageous conduct, demonstrating a conscious and blatant disregard for the health, safety, and rights of Plaintiff, and for the foreseeable consequences of their actions and omissions.

329.    Compensatory damages in an amount to be proven at trial, and in excess of the jurisdictional minimum of this Court, including but not limited to damages for:

- Past and future medical expenses;
- Costs of hospitalization, diagnostic testing, surgical intervention, and follow-up care;
- Physical pain and suffering;
- Emotional distress, anxiety, fear, and loss of enjoyment of life;
- Permanent injury, impairment, and disability.

330.    Special and consequential damages, including out-of-pocket expenses, future medical monitoring and treatment costs, and all other economic losses proximately caused by Defendants' wrongful conduct.

331.    Punitive and exemplary damages, in an amount sufficient to punish Defendants and to deter similar misconduct, based on Defendants' reckless indifference, conscious disregard of known safety risks, reckless and willful failure to comply with FDA safety warnings, and deliberate inaction in the face of foreseeable and life-threatening harm.

332.    Costs of suit, pre- and post-judgment interest as allowed by law, and reasonable attorneys' fees to the extent permitted by statute, rule, or equity.

333.    Such other and further relief—whether legal, equitable, or injunctive—as the Court deems just, proper, and necessary under the circumstances.

JURY TRIAL DEMANDED.


LEESON & LEESON

74

BY:   *//s// Joseph F. Leeson, III*____
     JOSEPH F. LEESON, III, ESQUIRE
     Attorney for Plaintiff
     PA Bar Id. No. 328520
     70 East Broad Street
     Bethlehem, PA 18016
     (610) 691-3320
     jleeson@leeson-law.com